**In the Interest of Baby Girl BRUNO, a Minor Child.**

No. 04–97–00438–CV.

Court of Appeals of Texas, San Antonio.

July 8, 1998.

**402**

Maria Estella Perez, Law Offices of Maria Estella Perez, Brownsville, for Appellant.

Patricia Wueste–Whitted, San Antonio, Jo Chris G. Lopez, Shaddox, Compere, Walraven & Good, P.C., San Antonio, for Appellee.

Before HARDBERGER, C.J., and RICKHOFF and ANGELINI, JJ.

## OPINION

ANGELINI, Justice.

Janie Bruno appeals a decree terminating her parental rights. After Bruno gave birth to a baby girl, she signed an Irrevocable Affidavit of Relinquishment of Parental Rights to a Licensed Child Placing Agency. Based on the affidavit, the trial court entered a decree terminating Bruno's parental rights, and the baby was placed with an adoptive family with whom she has since lived. Bruno raises four points of error contesting the validity of the decree. First, she contends that the affidavit of relinquishment is void because it was incorrectly notarized and witnessed. She further complains of procedural irregularities in the trial court. And finally, Bruno challenges the sufficiency of the evidence to support the decree. We affirm the judgment of the trial court.

### FACTUAL AND PROCEDURAL BACKGROUND

On January 24, 1997, Janie Bruno gave birth to a baby girl. Bruno was nineteen years old, unmarried, and living with her parents while attending college. Bruno concealed her pregnancy from her family and friends. When she went into labor, she drove herself to the hospital and informed hospital staff that she intended to place the baby for adoption. She instructed hospital staff not to allow any visitors in her room and not to disclose any information to her family members.

After the delivery, Bruno spoke with Cindy Moody, the hospital's social worker, and again expressed her desire to place the baby for adoption. Moody testified that she spoke with Bruno about the adoption procedure and presented her with other options. Moody informed Bruno that if she chose to place her baby for adoption, the decision would be irrevocable. According to Moody, Bruno was completely confident in her decision to place her baby for adoption. Bruno signed a document permitting Moody to contact an adoption agency on her behalf, and Moody contacted Adoption Affiliates at Bruno's request.

Later that day, Jan Couve, an Adoption Affiliates representative, contacted Bruno by telephone and confirmed Bruno's desire to place her baby for adoption. Couve explained the irrevocable nature of such a decision. When asked if she would like someone from Adoption Affiliates to come and visit with her in person about the adoption procedure, Bruno said that she would.

Monica Martinez, another Adoption Affiliates employee, met with Bruno at the hospital on January 25, 1997. Bruno again expressed her desire to place her baby for adoption. Martinez explained the adoption process and the legal documents necessary to initiate the process. Bruno signed several

preliminary documents, including a document informing her of her rights and responsibilities as a birth mother, a document identifying the two probable birth fathers, and an HIV release. She also signed a document consenting to the release of the baby by the hospital to Adoption Affiliates.

Martinez discussed with Bruno the irrevocable nature of an affidavit of relinquishment and informed her that she could not sign such an affidavit in the forty-eight hours following the baby's birth. Accordingly, Martinez advised Bruno to think about what she wanted to do and to call Adoption Affiliates when she had made a decision. Following her visit with Martinez, Bruno was discharged from the hospital.

On January 26, 1997, Bruno spoke with Jan Couve by telephone. She reconfirmed her desire to place her baby for adoption, and made arrangements for Couve to pick her up from her college the following day so that she could sign the papers necessary to terminate her parental rights and begin the adoption process. On January 27, 1997, Couve picked Bruno up from her college and drove her to the Adoption Affiliates office. At the office, Couve read the affidavit of relinquishment aloud to Bruno. Couve explained the affidavit to Bruno and told her that she was waiving her right to appear in court and to receive additional paperwork regarding the adoption process. Bruno was "very clear about wanting to proceed."

Bruno reviewed and signed the affidavit in front of two witnesses, and the affidavit was notarized by Couve. In bold type, the affidavit states:

> I realize that I should not sign this affidavit until I have read and understood each word, sentence and paragraph in it. I realize that I should not sign this affidavit of relinquishment if there is any thought in my mind that I might someday seek to change my mind. I realize that I should not sign this affidavit of relinquishment of parental rights if I am not thinking clearly because of illness, medication, my emotional state or any other reason. I know that once I sign this document I will no longer be legally considered to be the parent of my child, I know that by signing this docu-

ment and terminating my parental rights that I am acting in the best interest of my child. I confirm that I have read this affidavit of relinquishment, I understand it, and I desire to sign it.

Bruno initialed each line of the preceding paragraph. In the following weeks, Bruno cooperated with Adoption Affiliates in locating the two possible birth fathers. Once these two men were located and had signed the necessary documents waiving interest in the child, Adoption Affiliates petitioned the court for termination of the parental rights of Bruno and the two possible fathers. After considering the documents presented and the best interest of the child, the trial court entered a decree of termination on February 10, 1997. Shortly thereafter, the baby was placed with her adoptive family where she continues to live.

In the meantime, Bruno's parents received a bill for pediatric services from the hospital. They confronted Bruno and discovered that she had given birth to a child and placed her for adoption. As a result of this confrontation, Bruno contacted Adoption Affiliates on February 11, 1997, and informed them that she had changed her mind and that her parents would adopt the baby. She was informed that the affidavit of relinquishment was irrevocable and that the baby could not be returned to her.

Bruno filed a motion for new trial seeking to set aside the decree of termination. The trial court conducted a hearing at which Bruno, her mother, Moody, Martinez, Couve, and others testified. Bruno testified that she did not voluntarily execute the affidavit of relinquishment because it was not adequately explained to her and she was pressured by her fear of disappointing her parents. The trial court denied Bruno's motion for new trial.

## ARGUMENT AND AUTHORITY

### A. Validity of the Affidavit

#### 1. Notarization

█ In her first point of error, Bruno argues that her Affidavit of Relinquishment of Parental Rights to a Licensed Child Placing Agency and other related documents are

"null and void" because they were improperly notarized by employees of Adoption Affiliates. Bruno claims that because Adoption Affiliates was a party to the termination proceeding, its employees and representatives were disqualified from acknowledging the documents supporting the termination.

■ The evidence in this case does not support Bruno's contention. The fact that a notary public is in the employ of a party to a transaction will not necessarily disqualify her from notarizing a document related to that transaction unless the notary (1) has a direct pecuniary or beneficial interest in the transaction, or (2) identifies herself with the transaction by signing a written instrument as an agent for one of the parties. *Director, Dallas County Child Welfare v. Thompson,* 667 S.W.2d 282, 283 (Tex.App.—Dallas 1984, no writ); *B.A.L. v. Edna Gladney Home,* 677 S.W.2d 826, 832 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.).

The only documents relevant to Bruno's argument are those relied upon by the trial court in terminating Bruno's parental rights. By its terms, the decree of termination, as it pertains to Bruno, was based upon Adoption Affiliates' petition for termination, Bruno's affidavit of relinquishment, and the best interest of the child. Adoption Affiliates' attorney executed the petition for termination, and Jan Couve notarized the affidavit of relinquishment. Neither Jan Couve nor any other Adoption Affiliates employee identified herself with the termination of Bruno's parental rights by signing any of the relevant documents as an agent of Adoption Affiliates.

Further, the record contains no evidence that Jan Couve had any pecuniary or beneficial interest in the termination of Bruno's parental rights. Couve denied any such interest via affidavit. She acted merely as a salaried employee of Adoption Affiliates during this entire transaction. Her salary is not based on the number of relinquishments in which she was involved nor on the number of affidavits she notarized. She receives no fees for notary services. Couve is neither an officer nor a director of Adoption Affiliates. In her capacity as associate director, she is charged with assisting in the implementation of policies created by the board of directors.

She had no personal interest in the termination of Bruno's parental rights.

Under these circumstances, we find that Couve was not disqualified from notarizing the documents upon which the decree of termination is based.

## 2. Witnesses

■ In her second point of error, Bruno contends that the trial court erred in considering her affidavit of relinquishment because it was not made knowingly and voluntarily before two credible witnesses. Bruno argues that the affidavit of relinquishment is invalid because the witnesses did not know her well enough to determine whether she was signing it voluntarily.

Specifically, Bruno points to Couve's testimony that the witnesses were not informed of the contents of the document signed by Bruno. Couve testified that she asked the two individuals to witness the execution of some "legal documents" without given them further details. She did this out of respect for Bruno's concerns about confidentiality. Bruno also notes that she was not asked to reread the document in front of the witnesses and she was not introduced to the witnesses. Under these circumstances, Bruno argues that the witnesses did not know whether she signed her correct name, much less whether she signed the document knowingly and voluntarily.

Bruno's argument is without merit. The record reflects that, in the presence of the two witnesses, Bruno was asked to raise her right hand, swear to tell the truth, verify her name, provide identification, acknowledge that she read the document, acknowledge that she signed it freely and voluntarily for the purposes stated in the document, verify that the document was true and correct, acknowledge the importance of the document, and acknowledge that her signature on the document was final. She was given the opportunity to ask any questions. She was also asked if she had read each and every line before she initialed it. She then, still in the presence of the witnesses, initialed and signed the document in the appropriate places.

■ The Texas family code requires that an affidavit of relinquishment of parental rights be witnessed by two credible persons. TEX. FAM.CODE ANN. § 161.103(a)(2) (Vernon 1996). However, there is no requirement that the credibility of the witnesses be affirmatively proven or even that the witnesses be present when the document is signed. *In Interest of D.E.W.*, 654 S.W.2d 33, 35 (Tex. App.—Fort Worth 1983, writ ref'd n.r.e.) (presence); *See In re B.B.F.*, 595 S.W.2d 873, 875 (Tex.Civ.App.—San Antonio 1980, no writ) (credibility). If the witnesses need not even be present when the affidavit is signed, the circumstances in this case clearly indicate that the affidavit was properly witnessed. *See In re B.B.F.*, 595 S.W.2d at 875 (holding that signed, witnessed, and notarized affidavit of relinquishment is *prima facie* evidence of its validity).

## B. Procedural Requirements

■ In her third point of error, Bruno identifies several procedural errors that she contends entitle her to a new trial. First, she argues that, while she waived her right to receive service of citation, she was still entitled to receive a copy of the petition for termination pursuant to TEX.R. CIV. P. 119. However, by its very terms, Rule 119 requires the delivery of the original petition only when a party either accepts service or waives the issuance of citation *after suit is brought*. It does not apply in cases of pre-suit waiver. Further, in her affidavit of relinquishment, Bruno clearly stated, "I do not want to be informed further about the lawsuit, and I waive and give up my right to be given notice about anything going on in the lawsuit" and "I fully understand that I will not be further informed about the termination of parental rights suit." In light of this language, Bruno clearly waived her right to notification or information, in any form, of the termination proceeding. She can not now be heard to complain that she did not receive a copy of the petition for termination.

■ Bruno also contends that, although the family code allows pre-suit waivers of citation, it does not do away with the requirement that the citation, with proof of service, be on file for ten days before judgment is

entered, as required by TEX.R. CIV. P. 107. This argument is illogical. If a party waives service of citation, there is obviously no need for a citation to be issued, and there will certainly be no proof that citation was served. If a citation does not exist, it cannot be on file ten days before judgment is entered. Accordingly, TEX.R. CIV. P. 107 does not apply in this case or any other pre-suit waiver case.

## C. Sufficiency of the Evidence

In her fourth point of error, Bruno challenges the sufficiency of the evidence to support the decree of termination. She argues that the documents upon which the trial court relied were technically defective and that the hearing on the petition for termination was procedurally defective. Those allegations have been addressed above. She also contends that the affidavit of relinquishment is invalid because her execution of the affidavit was not voluntary and was perpetrated by fraud on the part of Adoption Affiliates employees.

■ An irrevocable affidavit of relinquishment and a petition for termination can alone support a judgment of termination. *Neal v. Texas Dept. of Human Services*, 814 S.W.2d 216, 224 (Tex.App.—San Antonio 1991, writ denied). It was the intent of the Legislature to make an irrevocable affidavit of relinquishment sufficient evidence on which the trial court can make a finding that termination is in the best interest of the child. See *Brown v. McLennan County Children's Protective Services*, 627 S.W.2d 390, 394 (Tex.1982). Accordingly, once a parent has surrendered custody of a child via an irrevocable affidavit of relinquishment, the affidavit may be set aside only upon proof, by a preponderance of the evidence, that the affidavit was executed as a result of coercion, duress, fraud, deception, undue influence or overreaching. *Coleman v. Smallwood*, 800 S.W.2d 353, 356 (Tex.App.—El Paso 1990, no writ).

■ In this case, Bruno makes allegations of overreaching on the part of Adoption Affiliates employees, but she offers no evidence to substantiate her allegation. At the hear-

ing on her motion for new trial, Bruno testified extensively about her emotional state at the time she signed the affidavit. She repeatedly stated that she decided to place her baby for adoption because she did not want her parents to discover that she had become pregnant and had a child, she was afraid of her parents' reaction, and she did not want to disappoint them. None of this constitutes evidence that she was coerced into signing the affidavit by anyone at Adoption Affiliates. In fact, the "pressure" she alleges forced her into signing the affidavit was caused by her own "fear." Bruno testified that the affidavit was not signed knowingly and voluntarily because she "didn't know what else to do" and she was "afraid." This testimony provides no evidence of coercion, duress, fraud, deception, undue influence or overreaching on the part of Adoption Affiliates. To the contrary, the evidence reflects that Bruno was given ample time and information to consider her decision, she made her decision resolutely, and she signed the affidavit voluntarily.

It is clear that after she signed the affidavit, Bruno changed her mind. However, such evidence is not enough to render the affidavit invalid. *See Brown*, 627 S.W.2d at 393 (stating that children voluntarily relinquished pursuant to that family code cannot be snapped back at the whim of the parent). The evidence in this case is sufficient to support the decree of termination.

The judgment of the trial court terminating Bruno's parental rights is affirmed.

Concurring opinion by RICKHOFF, J.

RICKHOFF, Justice, concurring.

While I must concur in the majority opinion, I write separately to emphasize that our laws regarding the termination of parental rights wrongly allow a teen mother to make the monumental and irrevocable decision to relinquish her child without professional guidance or a meaningful opportunity to reflect on the decision.[1]

It is shocking that in our rush culture a teenager may check into a hospital; acknowledge she has not consulted any traditional life-guides such as family, friends, clergy, and counselors; deliver her newborn; and six hours later begin signing the documents that will end forever her legal parenthood. Although an affidavit of relinquishment cannot be signed before forty-eight hours after the child's birth, *see* TEX. FAM.CODE ANN. § 161.103(a)(1), there is apparently nothing to prevent adoption agency representatives from contacting a very young mother before this period has expired and having her sign preliminary documents in the anticipation that she will relinquish her child. An unemancipated, unwed teenager's signature is worthless in the commercial world, as this young mother discovered when the hospital sent home the bill, ending the secret just after it was made irrevocable. Yet if this same teenager decides to transfer a life to an adoption agency, that decision is irrevocable the moment the affidavit of relinquishment is signed. *Compare id.* § 161.103(e) (Vernon Supp.1998) (affidavit of relinquishment to Department of Protective and Regulatory Services or licensed child-placing agency is irrevocable), *with id.* § 161.1035 (Vernon Supp.1998) (effective September 1, 1997) (other affidavits of relinquishment revocable before the eleventh day after the affidavit was signed). Such an affidavit is the most important document anyone will confront. Surely, some waiting period should be required.[2]

1. All know each newborn is an inestimable gift. Most know the natural mother is not always prepared, so this treasure is meant for the next outstanding couple on the adoption waiting list. Most want the transfer as quickly and permanently as possible because we value the best interest of the newborn first. Some know the lifetime cost to the young mother and how much courage she must muster during her pregnancy when she is making this decision. It is just too important, too decisive to be made in secret by the young without guidance. Adoption agencies, particularly for-profit ones, and their hospital fellow travelers, have a rather awesome responsibility to serve as a guide in this process. I believe they should be relieved of this task and it should pass to an independent agency that would provide professional guidance including all options, such as open adoptions.

2. Even as the senior justice on this court with fifteen years experience as an associate professor at a law school, I am allowed three days to cancel a contract to purchase consumer goods

Janie Bruno was alone but for the strangers who may have had agendas that precluded them from serving as impartial counselors regarding her irrevocable decision to relinquish her child. Surely, some form of objective counseling should be available.

Now the legislature and our courts rightly recognize that terminations and adoptions should be expeditious because childhood is brief. But we should also rethink our statutory waiting periods and make available some professional guidance to these very young mothers so that when we declare their relinquishments of parental rights irrevocable we are assured that mature reflection has preceded the decision.

signed at my home—a document that is far less important than the documents signed by Bruno and a setting that is far more comfortable than a

hospital. *See* TEX. BUS. & COM.CODE ANN. § 39.003 (Vernon Supp.1998).